UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

GLOBAL ART EXHIBITIONS, INC.,

                              Plaintiff,

         -against-

KUHN & BÜLOW ITALIA
VERSICHERUNGSMAKLER GMBH,
ERGO VERSICHERUNGS AG,
MANNHEIMER VERSICHERUNG AG,
BASLER SACHVERSICHERUNGS-AG,
HELVETIA SCHWEIZERISCHE
VERSICHERUNGSGESELLSCHAFT IN
LIECHTENSTEIN AG, and GOTHAER
ALLGEMEINE VERSICHERUNG AG,

                              Defendants.
-------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED:     6/15/2022

20-CV-1395 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

Plaintiff Global Art Exhibitions, Inc. ("Global Art") brought this action against five

insurers from Germany and Lichtenstein ("Insurer Defendants") and insurance broker Kuhn &

Bülow Italia Versicherungsmakler GmbH.  It alleges breach of an insurance contract covering

several works of art that Global Art arranged to send to an exhibition in Genoa, Italy, which were

seized by Italian authorities upon suspicion that the works were forgeries.  Global Art contends

that Insurer Defendants were obligated to make payments pursuant to the insurance policy's

coverage of legal expenses in connection with confiscation of the insured works of art.

Insurer Defendants moved to dismiss.  (ECF No. 64.)  The Court's prior Opinion and

Order resolved the motion's assertion that the Court lacked personal jurisdiction, and withheld

consideration of the remaining grounds for the motion to dismiss until such time as Insurer

Defendants came into compliance with New York Insurance Law § 1213(c).  (ECF No. 93.)

They have now done so.  In accordance with the Order at ECF No. 118, this Opinion and Order

resolves Insurer Defendants' remaining grounds for their motion to dismiss: lack of subject-

matter jurisdiction, *forum non conveniens*, and failure to state a claim upon which relief can be granted.  For the following reasons, the remainder of the motion is DENIED.

## BACKGROUND

The Court's November 16, 2021 Opinion described many of the facts of the case:

> Plaintiff Global Art is a privately held Delaware company that sells and exhibits works of fine art and has its principal place of business in New York, New York.  (First Amended Complaint ("FAC") ¶¶ 16, 34, ECF No. 55.)  An Italian art exhibition organizer, MondoMostre Skira s.r.l ("Skira"), requested the assistance of Global Art as Skira organized an exhibition to be held at the Palazzo Ducale in Genoa, Italy.  (*Id.* ¶¶ 2, 36.)  Global Art arranged for the lending of at least twelve works by the Italian painter Amedeo Modigliani and French painter Moïse Kisling.  (*Id.* ¶¶ 34, 36–37.)[1]  Two of these works are owned by Global Art, which also arranged for the loan of the works owned by others.  (*Id.*)
>
> Defendant Kuhn & Bülow Italia Versicherungsmakler GmbH ("Kuhn & Bülow") is a German insurance broker upon which Skira called to arrange for insurance to cover works lent for the Genoa exhibition.  (*Id.* ¶ 38.)  Kuhn & Bülow coordinated the creation of Policy No. EP 1032, an "all-risk" insurance policy that, in pertinent part, covered the twelve Modigliani and Kisling works shown in the Genoa exhibition that were lent by or through Global Art.  (*Id.* ¶ 40.)  The five other defendants in this case ("Insurer Defendants") are insurance firms based in Germany or Liechtenstein that each insured a specified percentage of the policy covering the works displayed in Genoa.  (*See id.* ¶ 46.)
>
> Global Art or the relevant owner received individual "Certificates of Insurance" specifying the coverage for the twelve works in question.  These certificates state that the insurance policy is a so-called "nail-to-nail" policy, which provides coverage up to the value of the work from almost any conceivable form of loss, depreciation, damage, or theft occurring between the departure of the work from its place of origin and its return after the exhibition.  (*See, e.g.*, *id.*, Ex. C §§ 1–4.)  Notably, section 5 of the "Written Agreements" appended to each certificate is a clause specifying that if the work were to be confiscated, the insurers would reimburse up to €500,000 for court and legal fees required to regain possession of the work.  (*See, e.g.*, *id.*, Ex. C § 5.)  The other owners whose works were lent through Global Art

---

[1] There is ambiguity in the complaint regarding whether the number of Modigliani and Kisling works lent by or through Global Art totaled twelve or fourteen.  What is clear is that there were nine such works originally from New York City that were lent by or through Global Art, insured by Insurer Defendants, and seized by Italian authorities.  (*See* FAC ¶ 48.)

assigned to Global Art the right to pursue "defense costs and related damages" under the policy.  (*Id.* ¶ 35.)  Skira paid the premiums for the policy in full.  (*Id.* ¶ 72.)

The exhibition did not go smoothly.  Acting upon allegations of inauthenticity, Italian authorities seized twenty-one works from the exhibition, including twelve lent by or through Global Art.  (*Id.* ¶¶ 3, 53–54.)  Legal proceedings in Italy relating to the seized artwork have been ongoing since at least mid-2018 (Frischknecht Decl., Ex. B, ECF No. 82) and remain pending (FAC ¶ 58).  Global Art has repeatedly demanded the return of the twelve seized Modigliani and Kisling works, but they remain in the custody of Italian officials.  (*Id.* ¶ 60.)

*Glob. Art Exhibitions, Inc. v. Kuhn & Bülow Italia Versicherungsmakler GmbH*, No. 20-CV-1395, 2021 WL 5331678, at *1–2 (S.D.N.Y. Nov. 16, 2021) (Wood, J.).[2]

In March 2018, Global Art made its first request for payment of legal costs pursuant to the confiscation clauses contained in the Written Agreements appended to the Certificates of Insurance and in the Kuhn & Bülow Terms and Conditions of Art Insurance 2016 (collectively, the "Policy").  (*See* Galimberti Decl., Ex. B, ECF No. 67-2.)  Global Art made repeated demands for payment over the course of more than two years; Insurer Defendants have yet to make any such payment.  (FAC ¶¶ 5–7.)

Global Art then brought this case, alleging Insurer Defendants breached their contractual obligations by failing to advance court costs and legal fees necessary for Global Art to regain possession of the confiscated works of art.  (*Id.* ¶ 71.)  Insurer Defendants moved to dismiss, asserting that the Court lacked personal jurisdiction over them, that Global Art's claim is not ripe, that the case should be dismissed under the doctrine of *forum non conveniens* in favor of a German court, and that the complaint failed to state a claim upon which relief could be granted. (ECF No. 64.)  This Court's November 16, 2021 Opinion decided the question of personal jurisdiction, dismissing the claims based on insurance coverage of three non-U.S.-based works of

---

[2] This Opinion is also accessible at ECF No. 93.

art for lack of personal jurisdiction.  (Op. at 11, ECF No. 93.)  The Court held in abeyance the other asserted grounds for the motion to dismiss until Insurer Defendants came into compliance with New York Insurance Law § 1213(c).  (*Id.* at 6.)  Insurer Defendants posted the security necessary to comply with the New York Insurance Law in January, making it now appropriate to resolve the balance of the motion to dismiss.  (ECF No. 105.)

## DISCUSSION

The Court has yet to adjudicate two primary grounds for Insurer Defendants' motion to dismiss.  First, Insurer Defendants moved to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, rooted in the contention that Plaintiff lacks standing because its claim is not ripe.  Insurer Defendants argue that they have no present obligation to pay under the contract's provision of confiscation coverage, either because (a) successful recovery of the works of art is a precondition that must be satisfied before an obligation to pay arises, or (b) Insurer Defendants are entitled to postpone insurance payments if there is "doubt" about an insured's entitlement to the payment or there are "official or criminal proceedings" against the policyholder or insured party as a result of the claim incident.  Second, Insurer Defendants moved to dismiss under the doctrine of *forum non conveniens*.  As explained below, neither line of argument has merit.[3]

---

[3] Insurer Defendants also move pursuant to Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, advancing two theories.  First, they maintain that, because Insurer Defendants do not have a present obligation to pay pursuant to the contract, Plaintiff fails to state a breach of contract claim upon which relief can be granted.  This argument mirrors those addressed in the analysis of Insurer Defendants' Rule 12(b)(1) motion.  It is baseless for the same reasons outlined below.  Second, Insurer Defendants attack two aspects of Plaintiff's prayer for relief: the prayer for punitive damages and the request for injunctive relief.  Motions to dismiss aimed at prayers for relief are premature except when such relief is categorically barred.  *See Doe v. Indyke*, 457 F. Supp. 3d 278, 283 (S.D.N.Y. 2020) (Engelmayer, J.).  Insurer Defendants' briefing, which asserts that Plaintiff has not pled the elements necessary for punitive damages in a breach of contract claim under New York law, includes no such argument.

## I.  Ripeness

Insurer Defendants' arguments based on ripeness implicate the Court's subject-matter jurisdiction.  They therefore present a threshold question that is properly adjudicated in a Rule 12(b)(1) motion.  *See Gelmart Indus., Inc. v. Eveready Battery Co.*, 120 F. Supp. 3d 327, 330 (S.D.N.Y. 2014) (Castel, J.) (citing *Auerbach v. Bd. of Educ.*, 136 F.3d 104, 108–09 (2d Cir. 1998)).[4]  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  The plaintiff, as the party asserting jurisdiction, has the burden to prove subject-matter jurisdiction by a preponderance of the evidence.  *Landau v. Eisenberg*, 922 F.3d 495, 497 (2d Cir. 2019).  A court reviewing a Rule 12(b)(1) motion takes all uncontroverted facts in the complaint as true, drawing reasonable inferences in favor of the plaintiff, but can look to evidence outside the pleadings, including affidavits, to resolve disputed jurisdictional facts.  *See Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).  In determining questions of foreign law, a court may consider any relevant materials, whether or not submitted by a party or admissible pursuant to the Federal Rules of Evidence.  *See Kashef v. BNP Paribas SA*, 442 F. Supp. 3d 809, 824 (S.D.N.Y. 2020) (Nathan, J.) (citing Fed. R. Civ. P. 44.1).

### A.  Precondition to Payment Obligation

Insurer Defendants argue that they have no present obligation to pay Plaintiff pursuant to the Policy—and that such an obligation will not arise unless and until Plaintiff recovers the

---

[4] Some questions of ripeness implicate only prudential, and not jurisdictional concerns.  *See Simmonds v. I.N.S.*, 326 F.3d 351, 354 n.2 (2d Cir. 2003) (Calabresi, J.).  Such is not the case here—Insurer Defendants contend that Plaintiff's claims are contingent on events that may never come to pass.  This argument poses the question of whether the claims present a "case or controversy" that falls within this Court's jurisdiction under Article III. Constitutional ripeness, unlike prudential ripeness, is a jurisdictional issue properly analyzed pursuant to Rule 12(b)(1).  *Cf. In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 109–10 (2d Cir. 2013).

confiscated works of art.  As a matter of contract interpretation, the first question to resolve is under which law the meaning of this contract is determined.  When applying the conflict-of-law rules of New York, "courts will generally enforce choice-of-law clauses and . . . contracts should be interpreted so as to effectuate the parties' intent."  *See Ministers & Missionaries Benefit Bd. v. Snow*, 45 N.E.3d 917, 919 (N.Y. 2015).  The Kuhn & Bülow Terms and Conditions of Art Insurance ("K&B Terms" or "Kuhn & Bülow Terms and Conditions") contain a valid choice-of-law clause selecting German law.[5]

Accordingly, German law governs in this action.  The applicable German rules of contract interpretation are quite similar to those that might prevail under New York law.  Insurer Defendants' German-law expert states, and Plaintiff does not contest, that disputes regarding the meaning of contracts are resolved under German law by determining "the objective interpretation of the disputed provisions[,] . . . based on the wording and accompanying circumstances of the agreement, taking into account the custom of trade and the principle of good faith . . . [and] the intentions of the parties."  (First Schöne Decl. ¶ 13, ECF No. 69.)

The second question is whether, under German law, the Policy makes payment pursuant to its confiscation clause contingent on the insured party first recovering its confiscated works of art.  An unmet precondition to performance can render a breach of contract claim unripe and suitable for dismissal on a Rule 12(b)(1) motion.  *See MBIA Inc. v. Certain Underwriters at Lloyd's, London*, 33 F. Supp. 3d 344, 356 (S.D.N.Y. 2014) (Scheindlin, J.) ("When there is a contractual condition that has not been met, the insured's claim against the insurer is barred and

---

[5] Plaintiff's German-law expert writes that the choice-of-law clause, which states that "the statutory regulations and provisions of German legislation shall apply" (Kuhn & Bülow Terms and Conditions § 24, ECF No. 55-1), is "not worded in the way a typical choice of law clause under German law would be drafted" (Siefarth Decl. ¶ 11, ECF No. 76).  Insurer Defendants' expert explains persuasively that this language is a translation of a standard choice-of-law clause written in German.  (*See* Second Schöne Decl. ¶ 6, ECF No. 83.)  The Policy evinces the parties' clear intent that German law apply.

is not ripe for adjudication.").[6]  Insurer Defendants' arguments that such a condition exists are unpersuasive.

Insurer Defendants assert that the text of the Policy creates a precondition that an insured party successfully recover confiscated works of art before payment becomes due on reimbursement of related legal costs.  The Written Agreements attached to the Certificates of Insurance associated with each of the covered works of art provide, "In the case of confiscation, the insurers will reimburse up to EUR 500.000,00 for costs – e. g. court and lawyer fees – which the lender might have to bear in order to resume possession of the objects of art."  (FAC, Exs. C– F, H–L ("Written Agreements") § 5, ECF Nos. 55-3, 55-4, 55-5, 55-6, 55-8, 55-9, 55-10, 55-11, 55-12.)  The Written Agreements expressly incorporate the Kuhn & Bülow Terms and Conditions.  (*See* FAC at 2–3.)  That document states that "[t]he risks of seizure, confiscation, deprivation of possession or other interventions on high authority of or in connection with insured items of art are included in insurance cover."  (K&B Terms § 8(j)(1), ECF No. 55-1.)  It also has its own provision regarding costs relating to confiscation: "The insurers shall reimburse costs for [two categories of costs] in order to return the insured items of art to the power of control or the disposition of the policyholder or of the insured party."  (*Id.* § 8(j)(2).)  The two

---

[6] Insurer Defendants refer the Court to several judicial decisions in which courts have granted a Rule 12(b)(1) motion to dismiss breach of contract claims for lack of ripeness when a condition precedent has not yet been satisfied.  These decisions, and other similar decisions the Court has reviewed, involve conditions precedent that were stated expressly or are otherwise clear and unambiguous.  *See EMR (USA Holdings), Inc. v. Goldberg*, No. 18- CV-7849, 2019 WL 5537878, at *5 (S.D.N.Y. Oct. 25, 2019) (Ramos, J.) (plaintiff had not satisfied condition precedent that "is black letter law in New York"); *Beazley Ins. Co. v. Ace Am. Ins. Co.*, 150 F. Supp. 3d 345, 354–55 (S.D.N.Y. 2015) (Rakoff, J.) (policy stated that coverage obligations "attach . . . only after" other coverage was exhausted); *MBIA*, 33 F. Supp. 3d at 356 (policy stated "[n]o action shall lie against Underwriters unless, as a condition precedent thereto, . . . the amount of the Assureds' obligation to pay shall have been fully and finally determined either by judgment against them or by written agreement between them"); *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 295 (S.D.N.Y. 2003) (Rakoff, J.) ("[T]he insurance contract between the parties expressly provides that defendant's payment obligation only arises 30 days after [submission of proofs of loss].").  Constitutional ripeness is a question of this Court's authority to hear a case pursuant to Article III.  *See Simmonds*, 326 F.3d at 357.  Accordingly, these authorities, rather than analogous decisions by German courts, bear on the question of how clearly a contractual precondition must be stated to deny the Court subject-matter jurisdiction.  However, Insurer Defendants fail entirely to demonstrate that a condition precedent to their obligation to pay remains unsatisfied.

categories of covered costs are (1) "bonds, securities or guarantees which the policyholder/the insured party must provide" and (2) "experts, specialists, lawyers and legal costs, inasmuch as their services were required." (*Id.*)  The second category is the one at issue in this case.

Insurer Defendants emphasize that the Policy covers legal costs "in order to return the insured items of art" and includes lawyers' work only "inasmuch as their services were required." (*See* Mem. at 8, ECF No. 65; Reply at 2, ECF No. 81.)  Insurer Defendants' briefing does not make entirely clear why this language should be read to condition Plaintiff's entitlement to payment on it first successfully recovering the works confiscated by Italian authorities. Implicitly, they suggest that a service may be considered "required" for a certain outcome only if that outcome actually occurs. (*See* Mem. at 8–9.)  The meaning of the word "required" does not support this interpretation. *See* Require, *New Oxford American Dictionary* 1483 (3d ed. 2010) (defining "require" as "need for a particular purpose" or "cause to be necessary").  Indeed, Plaintiff alleges explicitly that the legal services for which it seeks reimbursement are "*necessary* to protect and retrieve these [confiscated] works of art." (FAC ¶ 9 (emphasis added).)[7]

Because the Policy itself does not dictate the time by which covered legal costs must be paid, the due date of payment is determined according to the standard rules of German insurance law.  The parties agree that section 14 of the German Insurance Contract Act (*Versicherungsvertragsgesetz*, or "VVG") governs the time of performance of insurance

---

[7] Insurer Defendants also assert without explanation that the contract's use of the word "reimburse" strengthens their argument that coverage is subject to a precondition of successful recovery of the confiscated works.  The plain meaning of this term lends no support to this contention. *See* Reimburse, *New Oxford American Dictionary* 1472 (3d ed. 2010) (defining "reimburse" as "repay (a person who has spent or lost money)").  Global Art has incurred costs for legal services in the litigation regarding the authenticity of the covered works and it has made expenditures to the relevant counsel. (*See* Guttmann Decl. ¶¶ 9–11 ("I have no choice but to pay Mr. Sterpi's bills on a current basis to defend the authenticity of the works and resume possession of them. . . . Plaintiff has been forced to sell several of its other works to raise the funds necessary to continue to pay the bills from Mr[.] Sterpi and the experts.").)  A payment from Insurer Defendants to Global Art today would thus fit within the meaning of "reimbursement."

payments, so long as it is not displaced by specific contractual terms.  (*See* Third Schöne Decl. ¶ 9, ECF No. 117-1; Siefarth Aff. ¶ 6, ECF No. 116-1.)  The statute describes two paths to triggering an obligation to pay pursuant to an insurance contract.  The due date for payment is the earlier of (1) "when enquiries necessary to establish the occurrence of the insured event and the extent of the insurer's liability have been concluded," or (2) one month after notification to the insurer of the insured event, if the insured party "demands part payment in the amount which the insurer will at least be expected to pay."  *Versicherungsvertragsgesetz* ("VVG") § 14.[8]

Plaintiff's allegations are sufficient at this stage of litigation to show that payment is already due pursuant to German insurance law.  To be sure, Plaintiff does not explicitly allege that Insurer Defendants have concluded their necessary inquires or that Plaintiff demanded partial payment—one or the other of which would be necessary to trigger Insurer Defendants' duty to pay.  Plaintiff does,  however, allege that it is in dire need of funds to finance its legal expenses.  (FAC ¶¶ 6–7; *see also* Opp'n at 15 n.13, ECF No. 74.)  Insurer Defendants do not controvert this fact.  Global Art's president writes that "Plaintiff presently lacks the ability to pay the bills from Mr. Sterpi and the experts who have been retained to aid in the defense of the works," has "not yet been able to raise the funds necessary to pay those bills," and faces "greatly reduced" chances of success in litigation if it does not secure sufficient funds.  (Guttmann Decl. ¶¶ 10–11, ECF No. 100-1.)  The Court may reasonably infer that the cash-strapped Plaintiff took care to demand partial payment at least once while making "repeated demands for payment under the Policy" (FAC ¶¶ 5, 8), to increase its prospects of timely access to legal funds. Because the due date for reimbursement of legal costs is determined pursuant to VVG § 14,

---

[8] All citations to the *Versicherungsvertragsgesetz*, or German Insurance Contract Act, refer to the English translation provided by the Federal Ministry of Justice (*Bundesministerium der Justiz*) at https://www.gesetze-im-internet.de/englisch_vvg/englisch_vvg.html.

Insurer Defendants have a present obligation to pay.  The motion to dismiss on the basis that a contractual precondition to payment makes Global Art's claim unripe is denied.

### B.  Postponement Clause

Insurer Defendants also contend that the contract's "postponement clause" entitles them to delay reimbursement of Global Art's legal costs to an as-yet-undetermined date.  They assert that their right to postpone payment makes Global Art's claims unripe, justifying a Rule 12(b)(1) dismissal.[9]  Section 15(6) of the Kuhn & Bülow Terms and Conditions states, "[t]he insurer can postpone the payment if (a) there is doubt about the policyholder's or the insured party's entitlement to receive payment; [or] (b) official or criminal proceedings are in progress against the policyholder or the insured party on account of the claim incident."  (K&B Terms § 15(6).)  Insurer Defendants argue that their right to postpone payment pursuant to this clause has been triggered both by "doubt" about whether Global Art is entitled to receive payment due to two coverage exclusions in the Policy and by ongoing "official or criminal proceedings."  Both arguments fail.

#### i.   Doubt Regarding Global Art's Entitlement to Receive Payment

Two coverage exclusions form the basis for Insurer Defendants' arguments based on the "doubt" prong of the postponement clause.[10]  The Kuhn & Bülow Terms and Conditions expressly exclude from the scope of insurance coverage "[l]oss or damage caused by," among

---

[9] Insurer Defendants do not provide support for the proposition that this type of "postponement clause"—in contrast to a clear contractual precondition to an obligation—should be analyzed as a jurisdictional issue.  Their arguments fail even under the Rule 12(b)(1) standard, which allocates the burden of proof more favorably to a moving defendant than does the Rule 12(b)(6) standard.  *See Williams v. Long Beach Mortg. Co.*, No. 15-CV-5952, 2016 WL 5720810, at *3 (S.D.N.Y. Sept. 30, 2016) (Karas, J.), *aff'd*, 709 F. App'x 92 (2d Cir. 2018).  For this reason, the Court assumes without deciding that the issues presented by the postponement clause should be analyzed under the Rule 12(b)(1) standard.

[10] Insurer Defendants also raise a meritless argument that "doubt" is created by the uncertainty about whether Global Art will regain possession of the insured works at the conclusion of the Italian proceedings.  As explained above, Global Art's entitlement to reimbursement is not contingent on first regaining possession of the insured works of art.

other sources, "(a) inherent vice or the natural state and properties of the items on exhibition, shrinkage and the acquisition of odours" and "(j) intentional behaviour on the part of the policyholder." (K&B Terms § 4(2)(a), (j).) The section discussing coverage of legal costs arising from the confiscation of insured works has a "natural state and properties" exclusion, as well. It excludes from cover "loss or damage which has arisen because of the natural state and properties of the goods, even if confiscation, deprivation of possession or other interventions on high authority has/have been the cause of such loss or damage." (*Id.* § 8(j)(4).)

The first exclusion, for loss or damage caused by the "natural state and properties" of the insured works, does not apply. Neither party could identify a single instance of a German court interpreting the phrase *natürliche Beschaffenheit* ("natural state and properties") to refer to the authenticity or authorship of an item. (*See* Third Schöne Decl. ¶ 19; Siefarth Aff. ¶ 22.) Rather, the phrase refers to an item's *physical* properties, as is shown by the examples in section 4(2)(a) of the Kuhn & Bülow Terms and Conditions: "shrinkage and the acquisition of odours." (K&B Terms § 4(2)(a).) This interpretation accords with the traditional conception of the "natural state and properties" of goods that is used in German insurance law—a recent version of the German Insurance Contract Act [VVG] listed examples of losses from *natürliche Beschaffenheit* that included damage "caused by internal spoilage, shrinkage, ordinary leakage, as well as by defective packing of the goods or by rats or mice." (Siefarth Aff. ¶ 20 (quoting an English translation of the pre-2008 version of VVG § 131).)

The second exclusion, for loss or damage caused by "intentional behaviour on the part of the policyholder" (K&B Terms § 4(2)(j)), does not apply either. Global Art President Joseph Guttmann and two individual co-defendants are accused of, *inter alia*, (i) placing forged works of art into circulation and (ii) misleading the Palazzo Ducale about the authenticity of those forgeries. (*See* Berman Decl., Ex. A at 4, ECF No. 66-1.) Insurer Defendants suggest that they

11

may withhold payment until the conclusion of the criminal litigation because either alleged act might constitute "intentional behaviour."  If so, they contend, Global Art's legal costs would be a "loss or damage" that was caused by this intentional behavior and that therefore is excluded from coverage.  This argument falls short, because the alleged acts of Guttmann and his co-defendants are not "intentional behaviour" within the meaning of the Policy.

Based on the German-law experts' submissions, the exclusion clause's use of the word "intentional" refers to the intent *to cause* the insured event, not merely the intent *to commit an act* that ultimately results in the insured event.  Insurer Defendants' expert writes that the exclusion clauses "include language that appears to be an English translation of predefined legal terms that can be found in statutory provisions of German law."  (First Schöne Decl. ¶ 20.)  He elaborates that the language of the "intentional behaviour" exclusion "highly corresponds with § 81(1) VVG, which states: 'The insurer shall not be obligated to effect payment if the policyholder intentionally causes the insured event.'"  (Third Schöne Decl. ¶ 21.)  Both parties' experts provide judicial decisions that bear on the meaning of "intentional behaviour."  All four of these judicial decisions are in alignment—each analyzes the intent to cause an insured event. (*See id.* ¶¶ 21, 23; Siefarth Aff. ¶¶ 26–27.)

Under German law, intent encompasses two elements: knowledge and will.  (*See* Third Schöne Decl., Ex. K at 3, ECF No. 117-12.)  In the insurance context, the knowledge element requires that a person "acted in the awareness that his actions could cause damage to another person."  (Third Schöne Decl., Ex. L at 3, ECF No. 117-13; *see also* Third Schöne Decl., Ex. K at 3 ¶ 60.)  The will element requires, at a minimum, that the actor "approved or consciously accepted" that his or her actions would cause the insured event.  (Third Schöne Decl., Ex. L at 3.)  The "insured event" in the instant case is the incurrence of legal costs required to regain possession of insured works of art that have been confiscated.  The will element would therefore

be satisfied only if the policyholder "approved or consciously accepted" (*id.*) that its actions would cause it to incur reimbursable legal costs.

Insurer Defendants' argument that the conduct of Guttmann and his co-defendants could satisfy the will element fails for three reasons.  First, the Policy excludes coverage only for losses and damage caused by "intentional behaviour on the part of *the policyholder*."  (K&B Terms § 4(2)(j) (emphasis added).)  Insurer Defendants acknowledge that Skira is the policyholder (*see* Mem. at 1, 4, 10, 21) and provide no reason to believe that the exclusion would apply to the actions of Global Art.  Insurer Defendants misstep by speculating about the intent of Guttmann and his individual co-defendants without explaining why those individuals' intent should be attributed to Skira.  Second, it is implausible that Skira—or Global Art, for that matter— "approved or consciously accepted" that its actions would cause it to incur legal costs *due to the criminal prosecution of its chief corporate officers*.  (*See* Berman Decl., Ex. A at 3.)  Those officers are alleged to have committed fraud in the companies' core line of business (*see* FAC ¶¶ 34, 36), which can be expected to cause significant harm to the companies.  Third, the conduct alleged is insufficient to support Insurer Defendants' claim that the conduct was intentional. Insurer Defendants emphasize that Guttmann was accused of misleading the Palazzo Ducale regarding the authenticity of the insured works of art.  (*See* Mem. at 11.)  But obscuring the inauthenticity of artwork indicates an attempt to keep the supposed fraud hidden and thereby *avoid* confiscation and litigation.  If the co-defendants had successfully kept their purported fraud hidden, they would have prevented the "insured event" from occurring—Plaintiff would never have incurred the legal costs at issue in this case.  The co-defendants' actions belie the suggestion that they "approved or consciously accepted" that their conduct would cause the insured event.

13

Other provisions of the Policy further undermine Insurer Defendants' reliance on the "intentional behaviour" exclusion.  The Policy contains separate, narrow remedies for instances in which covered works of art are found to be forgeries, or insured parties are discovered to have misrepresented the authenticity of covered works.  One express provision lowers the insured value of works if they are revealed to be forgeries.  (*See* K&B Terms § 7.)  Another provision grants a remedy to insurers that discover that an insured party or policyholder submitted "incomplete and incorrect information" about "risk-significant circumstances"—such as the authenticity of a work.  (*See id.* § 9(2).)  In such cases, the insurers have a limited right to withdraw from the insurance policy.  (*See id.* § 9(5).)  It strains credulity to believe that the drafters of a contract would write a clause that merely *reduces* the insured value of forged works, and also create a *limited* remedy of withdrawal for non-disclosure of inauthenticity, if they intended to swallow both with an expansive definition of the "intentional behaviour" that affords a much more potent remedy—a complete excuse to performance.

Finally, the terminology used in the exclusion clauses bolsters the conclusion that neither of the Policy's coverage exclusions applies to the legal costs at issue.  The exclusion clauses carve out from coverage certain types of "loss or damage" (*id.* § 4(2)), but every reference to coverage for legal expenses uses a different term: "costs" (*see id.* §§ 4(2)(b), 8(j)(2); Written Agreements § 5).  The use of these different terms appears to be deliberate: The distinction is made even in a single, two-sentence-long subsection.  That passage reads, "*Loss or damage* caused by the following are excluded . . . [b] direct *damage* to the items of art because of seizure and confiscation.  The *costs* arising from this are, however, included in insurance cover as according to § 8, Sub-section j [the confiscation clause]."  (K&B Terms § 4(2)(b) (emphases added).)  The wording suggests that legal costs are not subject to any of the exclusions for "loss or damage."

### *ii.   Official or Criminal Proceedings*

Insurer Defendants' invocation of their right to postpone payment when "official or criminal proceedings are in progress against the policyholder or the insured party on account of the claim incident" is unavailing.  (*See* K&B Terms § 15(6).)  First, although there are pending criminal proceedings that relate to the confiscation at issue, neither Global Art nor Skira is party to those proceedings; instead, the criminal proceedings are against *individuals*, including Guttmann and five others.  (*See* Berman Decl., Ex. A at 3.)

Second, although the Palazzo Ducale brought a civil claim against Skira related to the confiscation (*see* Berman Decl., Ex. B at 2–4, ECF No. 66-2), Insurer Defendants provide no support for their contention that civil litigation is an "official . . . proceeding[]" within the meaning of the postponement clause (K&B Terms § 15(6)).  In fact, the parties' submissions suggest the opposite—that the phrase "official proceedings" excludes civil litigation and is closely associated with investigative efforts by governmental entities.

The final declaration by Insurer Defendants' German-law expert Friedrich Tobias Schöne states that German courts construe the phrase "official proceedings" to be related to an insurer's "enquiries necessary to establish the occurrence of the insured event and the extent of the insurer's liability."  (Third Schöne Decl. ¶ 30 (quoting VVG § 14(1)).)  Those enquiries must be completed before a full insurance payment becomes due pursuant to the German Insurance Contract Act.  *See* VVG § 14(1).  Schöne characterizes the judicial decisions he cites as reflecting the "well-established" legal principle that "official investigations," or *behördliche Ermittlungen*,[11] may "postpone the due date of payments if their outcome may in some way

---

[11] The parties' experts direct the Court to authorities discussing German phrases including *behördliche Ermittlungen*, *behördliches verfahren*, and *behördliche Ermittlungsverfahren* as relevant to the meaning of "official proceedings" in the Policy.

influence the insurer's obligation to indemnify." (Third Schöne Decl. ¶ 33.) He also directs the Court to a helpful leading commentary on the German Insurance Contract Act. The commentary first explains that it is permissible in principle for insurance contracts expressly to condition the due date for payment on the conclusion of "official investigative proceedings," because such proceedings often produce information that is material to the existence of an insured event. (Third Schöne Decl., Ex. P at 3 ¶ 30, ECF No. 117-17.) The commentary then appears to equate "official investigation proceedings" with "the investigative work of authorities" and, namely, "[i]nvestigation proceedings by the police and the public prosecutor's office." (*Id.* at 3 ¶¶ 20, 30.)

Taken as a whole, the materials provided suggest that the meaning of "official proceedings" in the Policy is limited to proceedings initiated by a governmental body, such as a prosecutor's office or regulatory agency. At a minimum, Insurer Defendants have provided no arguments or supporting authority affirmatively indicating that civil litigation initiated by a private party constitutes an "official proceeding." The civil claim that the Palazzo Ducale brought against Skira is therefore insufficient to trigger Insurer Defendants' right to delay payments pursuant to the Policy's postponement clause.

Insurer Defendants have failed to establish that Plaintiff's claim is unripe because a precondition to payment is not yet satisfied or because the Policy gives them the right to postpone payment under the present circumstances. Global Art's breach of contract claim thus presents a controversy within the subject-matter jurisdiction of this Court.

## II.    *Forum Non Conveniens*

Insurer Defendants also move to dismiss under the doctrine of *forum non conveniens*, urging that Germany is the appropriate forum.  "The doctrine of *forum non conveniens* is a discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim."  *Carey v. Bayerische Hypo–Und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004) (internal citation and quotation marks omitted).  The exercise of the Court's discretion is guided by the three-step process set forth by Second Circuit:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum.  At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute.  Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

*Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005) (citing *Iragorri* v. *United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001)).  A defendant generally "bears a heavy burden" when it seeks to invoke *forum non conveniens*.  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007).  Dismissal is warranted "only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable."  *Iragorri*, 274 F.3d at 74–75.  A court deciding a motion to dismiss for *forum non conveniens* may consider the pleadings as well as affidavits from both moving and opposing parties.  *See Martinez v. Bloomberg LP*, 740 F.3d 211, 216 (2d Cir. 2014).

### A.  Step One: Deference to Plaintiff's Choice of Forum

Courts give a high degree of deference to the plaintiff's choice of forum.  *See Norex Petroleum*, 416 F.3d at 154.  A court will increase or decrease the level of deference, depending upon whether the lawsuit was brought in the forum for legitimate reasons, such as "the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice," and

17

whether "considerations of convenience favor the conduct of the lawsuit in the United States." *Iragorri*, 274 F.3d at 72.  Great deference is given when a plaintiff sues in its home forum.  *See id.* at 71.  Global Art is thus entitled to a higher-than-typical degree of deference, given that its principal place of business is in Manhattan, within the geographic jurisdiction of its chosen forum, the Southern District of New York.  *See N.H. Ins. Co. v. Sphere Drake Ins. Ltd.*, No. 01-CV-3226, 2002 WL 1586962, at *6 (S.D.N.Y. July 17, 2002) (Jones, J.), *aff'd in part, vacated in part on other grounds*, 51 F. App'x 342 (2d Cir. 2002).

Insurer Defendants' arguments for reduced deference to Plaintiff's choice of forum are unavailing.  Courts afford less deference to a plaintiff's choice of forum when the plaintiff sought out business relationships in the alternative forum and therefore could reasonably expect to litigate there.  *See Carey*, 370 F.3d at 238.  Insurer Defendants contend that Plaintiff should not be surprised that it would be required to litigate insurance claims "in Europe" given its dealings on the continent.  (Mem. at 13.)  But Global Art hired an *Italian* company, Skira, to arrange insurance coverage for works of art to be exhibited in *Italy*.  It was Skira that then placed Global Art's insurance policy with a German company, Kuhn & Bülow.  (*See* FAC ¶ 38.) Seeking out relationships and doing business in Italy is not tantamount to consent to litigate in Germany.  *See Petersen Energia Inversora S.A.U. v. Argentine Republic*, No. 15-CV-2739, 2020 WL 3034824, at *8 (S.D.N.Y. June 5, 2020) (Preska, J.) ("*Carey*'s holding is not that any plaintiff voluntarily conducting business internationally is automatically entitled to lesser deference with respect to her choice of forum.").

Global Art's strong showing at step one of the analysis entitles its choice of forum to a particularly high degree of deference.  This deference "recalibrate[s] the balance for purposes of the remaining analysis," raising the bar that Insurer Defendants must surpass at steps two and three.  *Norex Petroleum*, 416 F.3d at 157.

18

**B.  Step Two: Adequacy of Alternative Forum**

With respect to the second step in the analysis, Germany is clearly an adequate alternative forum for this litigation.  "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute."  *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003).  Both conditions are met here.  First, all Defendants either are German entities subject to service of process in Germany or have indicated their willingness to submit to the jurisdiction of a German court.  (*See* FAC ¶¶ 17–22; Mem. at 14 n.9.)  Second, German courts permit litigation of breach of contract claims such as the one Global Art has raised against Insurer Defendants.  *See, e.g.*, *NCA Holding Corp. v. Norddeutsche Landesbank Girozentrale*, No. 96-CV-9321, 1999 WL 39539, at *2 (S.D.N.Y. Jan. 28, 1999) (McKenna, J.) (dismissing breach of contract claims on the basis of *forum non conveniens*, in favor of an alternative forum in Germany).

Plaintiff argues that several aspects of the German judicial process would make it financially impracticable to bring suit in that country.  But an alternative forum is sufficient even if its procedures and causes of action differ from those in a plaintiff's chosen forum, unless the remedies in the foreign forum are "tantamount to no remedy at all."  *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 189 (2d Cir. 2009).  Features such as the German requirement that plaintiffs post security for litigation costs and that the losing party in a lawsuit pays the attorneys' fees for the prevailing party do not meet that standard.  Furthermore, Plaintiff was mistaken in raising concerns about German courts' prohibition of contingent-fee arrangements in the discussion of this factor.  Such matters are properly considered in the balancing of interests during the third step of the *forum non conveniens* inquiry.  *See Murray v. Brit. Broad. Corp.*, 81 F.3d 287, 292 (2d Cir. 1996).  Germany is an adequate alternative forum for the instant litigation.

## C.  Step Three: Balancing of Private and Public Interests

In the final step of the analysis, the Court weighs the private and public interests implicated by the choice of forum.  "The defendant bears the burden of establishing . . . that the balance of private and public interest factors tilts heavily in favor of the alternative forum." *Abdullahi*, 562 F.3d at 189.  The showing required of Insurer Defendants in this case is even stronger than is usually necessary, because of the high degree of deference afforded Plaintiff's choice of its home forum.

### i.   *Private Interests*

Balancing the private interests entails "a comparison between the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country." *Iragorri*, 274 F.3d at 74.  The United States Supreme Court has set forth a non-exhaustive set of factors to consider. As relevant here, those factors include (1) "relative ease of access to sources of proof"; (2) availability of compulsory process to force the attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; and (4) "all other practical problems that make trial of a case easy, expeditious[,] and inexpensive." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).

Each of the first three of these factors depends on the location of evidence necessary to a trial in this case and the difficulties associated with seeking to produce that evidence before a court in the Southern District of New York.[12]  Success for Global Art on its breach of contract

---

[12] Insurer Defendants do not address at length whether the claims against Kuhn & Bülow, which has not appeared in this action, should be dismissed for *forum non conveniens*.  The Court briefly notes that the questions posed by Kuhn & Bülow are similar to those discussed in the rest of the *forum non conveniens* analysis.  First, Kuhn & Bülow is amenable to suit in Germany, like the other Defendants. (*See* First Schöne Decl. ¶ 28.)  Second, the balance of private and public interests would be similar, given that the second and third causes of action premise Kuhn & Bülow's alleged liability largely upon Insurer Defendants' failure to pay Global Art for the legal fees it has incurred after the Modigliani and Kisling works were confiscated.  The fourth asserted cause of action is inscrutable, as it does not explain how Kuhn & Bülow is alleged to be liable. (*See* FAC ¶¶ 88–90.)

claim against Insurer Defendants would require, at minimum, establishing that a binding contract exists, determining the meaning of that contract with respect to coverage of legal expenses in the case of confiscated covered artwork, assessing whether Insurer Defendants' conduct was in breach of the agreement, and, if so, fixing the amount of damages owed to Plaintiff.

The sources of proof for this claim are distributed across Germany, Italy, and the United States.  With respect to the existence and meaning of the contract, the relevant documentary evidence and witnesses are concentrated in Germany and Italy.  As stated previously, disputes regarding the meaning of contracts are resolved under German law by determining "the objective interpretation of the disputed provisions[,] . . . based on the wording and accompanying circumstances of the agreement, taking into account the custom of trade and the principle of good faith . . . [and] the intentions of the parties[.]"  (First Schöne Decl. ¶ 13.)  Plaintiff alleges that Skira, an Italian firm, arranged for Kuhn & Bülow, a German firm, to procure an insurance policy for works of art to be shown in Genoa.  (*See* FAC ¶ 38.)  The lead underwriter for Insurer Defendants was employed by the German firm ERGO and states that he communicated solely with Kuhn & Bülow—not Skira or any of the owners of the art, including Global Art.  (Hummels Decl. ¶ 8, ECF No. 68.)  Evidence that would assist the Court in deciding how the custom of trade, principle of good faith, and intentions of parties apply would thus be found largely in Germany, but also in Italy.  In contrast, deciding whether Insurer Defendants' failure to pay constitutes breach of the contract would require determining the existence of a qualifying confiscation event in Italy, ascertaining whether the legal expenses American firm Global Art incurred for Italian counsel are within the scope of the Policy's coverage, and establishing that Global Art made appropriate demands for payment.  The evidence and witnesses relevant to these questions would be found primarily in the United States and Italy.  The evidence needed to determine the quantum of damages would be found in the United States and Italy, as well.  The

meaning of the contract could well be the most intensely contested of the aforementioned questions at trial.  Even if it is, the ease of access to sources of proof would weigh only slightly in favor of a German forum.

Notably, Insurer Defendants do not contend that German courts would have a greater ability than this Court to secure evidence from non-parties in Italy through the use of compulsory process.  They also do not identify non-party witnesses or custodians of documentary evidence who reside in Germany and who would be outside the reach of this Court's jurisdiction.[13]  The availability of compulsory process is a neutral factor.

The cost of obtaining testimony from willing witnesses is, in the era of modern communications and transportation technology, a fairly minor factor.  *See Petersen Energia*, 2020 WL 3034824, at *11 n.11 ("[D]epositions can be conducted via videoconference; documents located overseas can be uploaded easily and reviewed by the parties via e-discovery platforms; and, if it comes to it, the parties can request that the Court allow trial witnesses to testify via video pursuant to the good cause exception in Fed. R. Civ. P. 43.").  Because Insurer Defendants do not identify the witnesses whose attendance they would likely seek (and do not even estimate the number of likely witnesses from Germany) it is difficult to credit their argument that the cost of obtaining testimony would be burdensome.

Finally, the Court notes that Insurer Defendants seem to have substantially more resources than Plaintiff with which to bear the inconveniences of distant litigation.  Plaintiff asserts in its briefing that Global Art "is a very small company with modest means compared to the Insurer Defendants."  (Opp'n at 15 n.13.)  Plaintiff states that Germany's prohibition on

---

[13] The ability to obtain documentary evidence and testimony from the parties is of little concern.  *See Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 375 (S.D.N.Y. 2006) (McMahon, J.) ("[P]arties can compel the testimony of their own employees without the need for subpoena.").

22

contingent-fee arrangements for legal services, requirement that plaintiffs post security costs in advance, and rule that a losing party pays its adversary's legal costs make it "virtually impossible" for a firm of its size to litigate in Germany.  (*Id.* at 15.)  The unavailability of contingent-fee arrangements, along with the need for plaintiffs to post security, accentuates the financial burden Plaintiff would need to bear if litigating in Germany.  *See Murray*, 81 F.3d at 292.

In contrast, the complaint alleges that four out of five Insurer Defendants are wholly owned subsidiaries of internationally prominent insurance providers.  (FAC ¶¶ 18, 20–22.)  For example, lead underwriter ERGO is a subsidiary of global giant Munich Re.  *Cf. Carey*, 370 F.3d at 238 ("For an individual of modest means, the obligation to litigate in a foreign country is likely to represent a considerably greater obstacle than for a large business organization— especially one maintaining a business presence in foreign countries.").  The relative resources of the parties weigh slightly in favor of litigation in the Southern District of New York.

Insurer Defendants have not shown the private interest factors to weigh in favor of dismissal.

### ii.  *Public Interests*

The final consideration is the public interests implicated by the choice of forum. Relevant factors include (1) "the administrative difficulties flowing from court congestion," (2) the "'local interest in having localized controversies decided at home'" and "the unfairness of burdening citizens in an unrelated forum with jury duty," and (3) "the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law."  *Piper Aircraft*, 454 U.S. at 241 n.6 (quoting *Gilbert*, 330 U.S. at 509).

The first factor, administrative difficulties flowing from court congestion, is neutral.  The Southern District of New York may have one of the nation's busiest dockets, but its

administration is very efficient.  Insurer Defendants do not contend that the relevant German

courts have less congested dockets, and there is no basis to assume that they do.  *See Strategic*

*Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 774 (S.D.N.Y. 2006)

(Leisure, J.).  In any case, when a federal court has a "full complement of judges for the

District," as the Southern District likely will soon,[14] it makes the concern of judicial burden "of

little or no present significance."  *Guidi v. Inter-Cont'l Hotels Corp.*, 224 F.3d 142, 147 n.5 (2d

Cir. 2000).

      Second, New York has a stronger local interest in the controversy in this litigation.  "New

York has an extremely strong interest in ensuring that [foreign] insurers follow through on the

commitments they make to New York citizens."  *Twin City Fire Ins. Co. v. Harel Ins. Co.*, No.

10-CV-7842, 2011 WL 3480948, at *3 (S.D.N.Y. Aug. 5, 2011) (Jones, J.).  That interest is

reflected by the state's requirement that unauthorized non-U.S. insurers post security before

litigating against a New York resident in relation to an insurance contract—a provision that has

already been addressed in this case.  (*See* Op. at 4–6.)  The statute imposing that requirement has

the explicit legislative aim of providing New York residents with the option to resolve their

insurance controversies in their home forum.  *See* N.Y. Ins. L. § 1213(a) (describing a purpose of

"subject[ing] certain insurers to the jurisdiction of the courts of this state" because of concerns

that non-U.S. insurers would present to New York residents "the often insuperable obstacle of

resorting to distant forums for the purpose of asserting [their] legal rights").  Germany certainly

has an interest in the operations of companies that are organized under its laws and housed

within its borders.  But Insurer Defendants have not shown that Germany's interest in this

---

[14] While the Southern District has several vacancies today, they are likely to be filled in short order.  *See Current Judicial Vacancies*, U.S. Courts, https://www.uscourts.gov/judges-judgeships/judicial-vacancies/current-judicial-vacancies (last accessed June 14, 2022) (listing nominees for all three S.D.N.Y. vacancies that have been open for more than three months).

litigation is as strong as that of New York.  Trying the case before a New York jury would be an effectuation of New York public policy, not an unfair burden on the people of New York.  The local interest factor weighs in favor of the Court retaining jurisdiction over this case.

Third, the need to apply foreign law in this case weighs only slightly in favor of dismissal.  Courts "must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform."  *Manu Int'l, S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 68 (2d Cir. 1981).  The questions of German law in this case are relatively straightforward issues of contract interpretation and of the substantive law of insurance.  They are not the type of novel questions that deserve to be resolved in the first instance by a court of the relevant jurisdiction.  *Cf. Finch v. Xandr, Inc.*, No. 21-CV-5964, 2021 WL 5910071, at *5 (S.D.N.Y. Dec. 14, 2021) (Marrerro, J.) (dismissing case presenting novel questions relating to the United Kingdom's General Data Protection Regulation).  Accordingly, the Court gives this factor little weight.

In sum, the public factors weigh in favor of leaving Plaintiff's choice of forum undisturbed.

Insurer Defendants have not met their burden to show that balance of private and public factors tilts heavily in favor of an alternative forum in Germany.  Particularly in light of the high degree of deference due Plaintiff's choice of its home forum, the Court will not disturb Global Art's decision to bring this case in the Southern District.  Insurer Defendants' motion to dismiss for *forum non conveniens* is denied.

## CONCLUSION

For the foregoing reasons, the remainder of Insurer Defendants' motion to dismiss is DENIED.  The parties are directed to submit by July 6, 2022 a joint proposed Scheduling Order

and Discovery Plan, based on the templates found on this Court's individual web page.  An

Initial Pretrial Conference will be held in this case on July 20, 2022 at 2:00 p.m. in Courtroom

26A of the Daniel Patrick Moynihan United States Courthouse.

      SO ORDERED.

Dated: New York, New York
      June 15, 2022                */s/ Kimba M. Wood*
                                      KIMBA M. WOOD
                            United States District Judge